**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

THOMAS LANCASTER,

                              Petitioner,

            - v -                                          9:19-CV-0583
                                                            (GLS/DJS)
R. COVENY, Superintendent,

                        Respondent.


**APPEARANCES:**                    **OF COUNSEL:**

THOMAS LANCASTER
Petitioner, *Pro Se*
13-B-0805
Elmira Correctional Facility
P.O. Box 500
Elmira, New York 14902

HON. LETITIA JAMES                  JAMES FOSTER GIBBONS, ESQ.
Attorney General of the State of New York    Assistant Attorney General
Attorney for Respondent
28 Liberty Street
New York, New York 10005

**DANIEL J. STEWART**
**United States Magistrate Judge**


## REPORT-RECOMMENDATION and ORDER[1]

    *Pro se* Petitioner Thomas Lancaster is currently incarcerated at Elmira

Correctional Facility.  He seeks a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.

---

[1] This matter was referred to the undersigned for a report-recommendation pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

Petitioner's incarceration stems from his conviction on March 14, 2013, for two counts of criminal sexual act in the first degree, one count of rape in the first degree, one count of aggravated sexual abuse in the first degree, and one count of predatory sexual assault. State Court Record ("SR.") at p. 65.[2]  Petitioner was sentenced on all charges to an aggregate term of 40 years imprisonment to life.  *Id.*  The Appellate Division, Third Judicial Department, unanimously affirmed the A-II felony conviction for Predatory Sexual Assault, as well as the sentence imposed by the County Court on that charge; to wit: 20 years to life.  *People v. Lancaster*, 143 A.D.3d 1046 (3d Dep't 2016), *leave to appeal denied*, *People v. Lancaster*, 28 N.Y.3d 1147 (2017), *reconsideration denied, People v. Lancaster*, 29 N.Y.3d 999 (2017).   The Appellate Division, however, dismissed the first-degree rape, aggravated sexual abuse, and criminal sexual act charges as being lesser included offenses of the top count of predatory sexual assault, and accordingly, vacated the sentences imposed on those charges.  *Id.*  Pursuant to N.Y. CRIM. PROC. LAW § 300.40(3)(b), the dismissal of those lesser included counts does not constitute an acquittal.  *Id.*

Petitioner asserts the following grounds for habeas relief in the present Petition: (1) that the trial court erred in not discharging a seated juror whose nephew was a

---

[2] Citation to the State Court Record at Dkt. Nos. 18, 22, & 22-1 is in the form "SR." followed by the page numbering provided by Respondent in the lower right-hand portion of the Exhibit.

possible prosecution witness; (2) that evidence was obtained pursuant to an unconstitutional search of Petitioner's home; (3) that the Predatory Sexual Assault count was duplicative and violated Petitioner's double jeopardy rights; (4) that the Predatory Sexual Assault statute is void for vagueness and was used against Petitioner in an arbitrary and discriminatory manner; (5) that the Petitioner's due process and fair trial rights were violated when the court seated two jurors who, during voir dire, failed to give unequivocal assurances that they could be fair and impartial; (6) that the court erred in not dismissing a juror who slept during the trial; (7) that the prosecutor violated her obligations under *Brady*; (8) that Petitioner's trial counsel was ineffective; (9) that the grand jury and trial evidence as to the Predatory Sexual Assault count was legally insufficient; and (10) that Petitioner is actually innocent.  Dkt. No. 1, Pet.

Respondent opposes the Petition and contends that the application should be denied.  Dkt. No. 17, Resp.'s Mem. of Law.  Petitioner has submitted a Traverse.  Dkt. No. 23.  For the reasons that follow, it is recommended that this action be dismissed in its entirety.

## I. BACKGROUND

Petitioner was charged in a nine-count indictment on March 16, 2012, with three counts of criminal sexual act in the first degree; two counts of rape in the first degree; and three counts of aggravated sexual abuse.   SR. at pp. 66-74.   The allegations

contained in the indictment involved five separate victims and acts which occurred at various times and locations within Broome County, New York. *Id.* The ninth and most serious count of the indictment was for predatory sexual assault under New York State Penal Law § 130.95(2). *Id.* As stated in New York's Penal Law:

> A person is guilty of predatory sexual assault when he or she commits the crime of rape in the first degree, criminal sexual act in the first degree, aggravated sexual abuse in the first degree, or course of sexual conduct against a child in the first degree, as defined in this article, and when: …
>
> 2. He or she has engaged in conduct constituting the crime of rape in the first degree, criminal sexual act in the first degree, aggravated sexual abuse in the first degree, or course of sexual conduct against a child in the first degree, as defined in this article, against one or more additional persons …

N.Y. Penal Law § 130.95. Predatory sexual assault is a class A-II felony. *Id.*

After his arrest on January 27, 2012, Petitioner was unable to raise sufficient funds for bail and remained in custody. SR. at pp. 75 & 290-291. He was arraigned on the indictment on March 23, 2012. SR. at pp. 287-291. Petitioner was represented by counsel throughout the course of the criminal prosecution, and that counsel filed numerous motions on his behalf, including motions to suppress statements given to the police, as well as a motion to suppress certain evidence which was discovered at Petitioner's home in his absence. SR. at pp. 288, 297-323. The matter was handled by Broome County Judge Martin Smith, who addressed the various motions, ordered

hearings, and formally denied the motion to suppress. SR. at pp. 354-460. The matter then proceeded to trial on or about November 19, 2012. SR. at p. 501.

Count I of the indictment charged Petitioner with criminal sexual act in the first degree, based upon allegations that on or about February 2011, Petitioner engaged in anal sexual contact by forcible compulsion. SR. at p. 66. The alleged victim of this offense, "April," testified at trial that she was in bed with Petitioner when she refused his request for sex, but that he nevertheless penetrated her anally. SR. at pp. 961-964. According to April, the act "hurt a lot" and resulted in bleeding afterwards. *Id.* She left Petitioner's home one week later. *Id.* Petitioner denied the allegation and asserted that April, whom he met on Craigslist, had moved in with him along with her children; that their relationship was consensual; and that he asked April to move out because he did not get along with her family. SR. at pp. 1483-1490. The trial jury acquitted Petitioner of this charge. SR. at pp. 65 & 1630.

Counts II and III charged Petitioner with two counts of a criminal sexual act in the first degree related to victim "AB." SR. at pp. 67-68 & 846. The indictment alleged oral or anal sexual contact by forcible compulsion, which is said to have occurred on or about November 21, 2010, in Broome County. *Id.* The trial testimony was that Petitioner, AB, and others went out to celebrate Petitioner's birthday, that he became intoxicated, and after Petitioner and AB returned to Petitioner's trailer, Petitioner

4

choked AB, forced her to perform oral sex on him, slapped her, and then compelled her to engage in anal sex against her will.  SR. at pp. 849-855.  As to the latter act, AB testified that she felt like she was "being ripped apart."  SR. at p. 857.  Petitioner again disputed the allegations, noted that he was intoxicated that evening, and asserted that when he texted AB that their relationship would not work, she responded by threatening to report him for rape if he did not give her money.  SR. at pp. 1470-1481.  Petitioner was convicted of both counts relating to AB.  SR. at p. 1630.

In Count IV of the indictment, the grand jury charged Petitioner with rape in the first degree.  SR. at p. 69.  The trial testimony from "J" was that in March of 2008, Petitioner had asked her to assist with housekeeping and childcare, but when she arrived at his residence, he pushed her down on his bed, held both of her wrists, and vaginally raped her.  SR. at pp. 899-905.  After the act, when Petitioner got up to go to the bathroom, J ran out of the trailer and never saw him again.  SR. at p. 905.  Petitioner, for his part, testified that he had dated J for two months and that any sexual contact was consensual.  SR. at pp. 1461-1467.  Petitioner was acquitted of this charge.  SR. at p. 1630.

Counts V and VI of the indictment relate to an individual identified as "KB."  SR. at pp. 70 & 1184.  Count V alleged that between January 17-18, 2012, Petitioner used forcible compulsion to engage in sexual intercourse with KB.  SR. at p. 70.  Count

VI alleged that during the same time Petitioner, by forcible compulsion, inserted a foreign object into KB's vagina. SR. at p. 71. KB's trial testimony was that she and Petitioner met online in January of 2012, and they agreed to go on a date to dinner and a movie. SR. at pp. 1185-1186. When she arrived at Petitioner's home, however, he threatened her and inserted a black 10-inch-long dildo into her vagina. SR. at pp. 1195-1198. KB testified that it was painful, and she screamed out. *Id.* Later that evening, KB testified that Petitioner raped her vaginally, threatened to beat her, and that she was terrified. SR. at pp. 1201-1203. She reported the assault to her roommate when she returned home, and thereafter to the police. SR. at p. 1209. A nurse practitioner, Debra Dibartolo, testified that she conducted a sexual assault examination of KB in the emergency department at the hospital. SR. at p. 1311. Dibartolo observed bruising and tenderness, including skin erosion around KB's genitalia, all of which were consistent with a forcible sexual assault. SR. at pp. 1314-1318. At trial, KB identified the sexual device obtained from Petitioner's home as the one used on her during the sexual assault. SR. at pp. 1211-1212. DNA testing performed on the blood obtained from the middle of that device identified KB as the main contributor. SR. at pp. 1381-1382.

Petitioner testified that his sexual relationship with KB was consensual, as was her use of the large sexual device. SR. at pp. 1425-1434. He testified that KB advised

him that she wanted to stay with him forever.  SR. at p. 1437.  Petitioner was convicted of both charges that related to KB.  SR. at pp. 1630-1631.

Counts VII and VIII of the indictment charged Petitioner with aggravated sexual abuse in the first degree against his wife, HF.  SR. at pp. 72-73 & 1009.  Count VII alleged that on or about the summer of 2009 to the fall of 2009, Petitioner did insert a foreign object into the anus of HF by means of forcible compulsion.  *Id.*  Count VIII alleged that on or about the summer of 2007, Petitioner did insert a foreign object into the vagina of HF by means of forcible compulsion.  SR. at p. 73.  The trial testimony from HF was that she dated and then married Petitioner, and during those years he abused her physically, emotionally, and sexually, including forcing her into prostitution.  SR. at pp. 1011-1021.  In August 2009, Petitioner directed HF to husk a large ear of corn and insert the corn cob three-quarters into her rectum and would not allow her to stop despite her pleas to do so.  SR. at pp. 1021-1026.  This resulted in pain and bleeding for the next few days.  *Id.*  HF also testified that during the summer of 2007, despite her protests, Petitioner penetrated her vaginally and anally with a foot-long, three-inch-wide sexual device, causing pain and several days of bleeding.  SR. at pp. 1027-1031.  HF did not report either of these two incidents to authorities.  SR. at p. 1032.

Petitioner denied the allegations and maintained that his wife, HF, could not be controlled, and at times voluntarily worked as a prostitute.  SR. at pp. 1453-1454 & 1461.  The jury acquitted Petitioner of the charges related to HF.  SR. at p. 1631.

As noted above, on November 29, 2012, after several days of evidence, the jury returned a split verdict and convicted Petitioner only on Counts II, III, V, & VI, as well as Count IX, the predatory sexual assault allegation.  SR. at pp. 1630-1631.  On or about March 14, 2013, the County Court sentenced Petitioner to an aggregate prison term of 40 years to life.  SR. at pp. 65, 1664 & 1668-1683.

Petitioner appealed his conviction and sentence to the Appellate Division, Third Judicial Department.  On October 20, 2016, the Third Department issued a ruling which upheld the jury's conviction on the top charge of predatory sexual assault and held that the County Court's imposition of a 20 years to life sentence on that charge was in all respects proper.  *People v. Lancaster*, 143 A.D.3d 1046.  The Appellate Court agreed with Petitioner, however, that a separate sentence on the lesser included offenses was improper and must be vacated.  *Id.*  Leave to appeal was denied by the New York State Court of Appeals.  *People v. Lancaster*, 29 N.Y.3d 999.  On November 30, 2017, Petitioner filed a motion to vacate his conviction pursuant to N.Y. CRIM. PROC. LAW § 440.10.  SR. at pp. 2029-2217.  That motion was denied by Broome County Court Judge

Joseph Cawley on September 22, 2018.  SR. at pp. 2523-2530.  The present Petition was filed on April 2, 2019.  Dkt. No. 1.

## II.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), a petitioner bears the burden of proving by a preponderance of the evidence that he is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); *Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir. 1997); *Rivera v. New York*, 2003 WL 22234697, at *3 (S.D.N.Y. Aug. 28, 2003).  A federal court may not grant habeas relief to a state prisoner on a claim unless the state court adjudicated the merits of the claim and such adjudication either

> 1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Hawkins v. Costello*, 460 F.3d 238, 242 (2d Cir. 2006).

The Second Circuit has summarized the application of the standard of review under AEDPA as follows:

> [u]nder AEDPA, we ask three questions to determine whether a federal court may grant habeas relief: (1) Was the principle of Supreme Court case law relied upon in the habeas petition "clearly established" when the state court ruled?  (2) If so, was the state court's decision "contrary to"

that established Supreme Court precedent?  (3) If not, did the state court's decision constitute an "unreasonable application" of that principle?

*Williams v. Artuz*, 237 F.3d 147, 152 (2d Cir. 2001) (citing *Williams v. Taylor*, 529 U.S. 362 (2000) and *Francis S. v. Stone*, 221 F.3d 100, 108-09 (2d Cir. 2000)).  The standard of review under section 2254(d) is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt."  *Renico v. Lett*, 559 U.S. 766, 773 (2010).  "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

The phrase "clearly established Federal law" refers to "the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision."  *Williams v. Taylor*, 529 U.S. at 412.  A state court decision is "contrary to" established Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by th[e] Court on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts."  *Id.* at 413.  A state court decision is an "unreasonable application" of established Supreme Court precedent "if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the

prisoner's case." *Id.* AEDPA also requires that "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also DeBerry v. Portuondo*, 403 F.3d 57, 66 (2d Cir. 2005); *Boyette v. LeFevre*, 246 F.3d 76, 88 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(e)(1)).

### III. DISCUSSION

### A. Petitioner's Fourth Amendment Claim

As an initial matter, Petitioner maintains that a sexual device found in his home and taken as evidence was obtained as the result of an unlawful search by police. Pet. at pp. 21-23. Such a claim, however, is not proper for habeas review.

The facts regarding the search of Petitioner's home were set forth at the *Mapp/Huntley* hearing that was held by the trial court on September 4, 2012. SR. at pp. 354-455. In late January 2012, the State Police had received a rape complaint from KB against Petitioner, and as part of their investigation had obtained a search warrant to search the residence of Petitioner at 503 Kent Street, Windsor, New York. SR. at pp. 365 & 408. During the execution of that search warrant on January 27, 2012, Petitioner was taken into police custody and transported to State Police barracks. SR. at pp. 365-368. Petitioner's brother, Fred Fraley, was present at the residence at the time that the search warrant was executed. SR. at pp. 432-433. When Petitioner was placed in

custody, Mr. Fraley took control of Petitioner's son with his consent, and after the police left, took the child to his grandmother's home.  SR. at pp. 75 & 434-436.

The search warrant authorized a search of the entire home for evidence related to the alleged sex offense.  SR. at pp. 408-409 & 413-414.  Two of the items listed in the warrant were bedding and a dark colored sexual device that was allegedly used during the commission of one of the sexual assaults.  SR. at pp. 414 & 457.  When State Police investigators entered the home, however, portions of it were extremely cluttered which apparently impeded their ability to locate various items, and in particular, the sexual device.  SR. at pp. 411-412, 420-421, & 457.

The day after Petitioner's arrest and the attempted search, Petitioner spoke with his brother Fred on the phone.  SR. at p. 436.  Based on his own prior experience, Fred Fraley was concerned that Petitioner would lose the house because of his incarcerated status, and as a result, could lose his personal property as well.  SR. at p. 450.  Petitioner agreed with this sentiment, and authorized Fraley to clean up the house and pack and store items.  SR. at pp.  436 & 450.  Pursuant to that authorization, Fraley returned to the residence to do as requested.  During that cleanup work, Fraley came across the sexual device that was listed in the search warrant inventory.  SR. at p. 421.  According to Mr. Fraley, he located the item in a back storage room, buried under several other items, in a suitcase with lingerie.  SR. at pp. 422 & 437.  Fred Fraley then contacted the

12

State Police on February 1, 2012, about what he had discovered and they returned to Petitioner's residence and took custody of the item.  SR. at pp. 421 & 457.

After Petitioner's arrest and subsequent indictment, his counsel filed motions with the Broome County Court seeking, *inter alia*, to suppress the physical evidence that was taken from Petitioner's residence.  SR. at pp. 302-323.  Petitioner's counsel argued that the sexual device in question was taken from Petitioner's abode in violation of his Fourth Amendment rights.  SR. at pp. 316-317.

The trial court denied Petitioner's Motion to Suppress the sexual device.  SR. at pp. 457-460.  The court held that the police had a reasonable basis to conclude that Fred Fraley was authorized to consent to the retrieval of the item from the residence.  SR. at p. 458.  As stated by the court: ". . . the search was limited to entering the defendants' home to secure evidence found by a private individual not acting as an agent of the police and photograph the location of the evidence; the property was listed in the search warrant; no further evidence was secured nor was any additional search conducted of the storage room or any other room; the police reasonably relied upon the consent of the defendant's brother to conduct the search; and the defendant's brother had actual control over the premises."  SR. at p. 459.

This issue was fully raised on appeal, and the appellate court concluded:

13

The testimony at the suppression hearing established that defendant entrusted his brother with his home, authorizing him to come and go in order to clean up, provide his children with their belongings and remove defendant's personal property should defendant lose his home while incarcerated. The second search was limited in scope to the entry of a specific room in the home so that the State Police could retrieve only the item that Fraley had discovered. Given these circumstances, County Court properly found that Fraley possessed the requisite authority to consent to the second search of the home and that the officers' belief that Fraley had the apparent authority to consent to the search of defendant's home was reasonable. Accordingly, County Court properly denied defendant's motion to suppress the item[.]

*People v. Lancaster*, 143 A.D.3d at 1050 (internal citations and quotations omitted).

Any challenge to the search of Petitioner's residence in this proceeding is therefore foreclosed by the Supreme Court's decision in *Stone v. Powell*, 428 U.S. 465 (1976).  Under *Stone*, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim," federal habeas corpus relief will not lie for a claim that evidence recovered through an illegal search or seizure was introduced at trial.  *Id.* at 482.  "The *Stone v. Powell* doctrine applies to all Fourth Amendment claims, including claims of illegal stops, arrests, searches, or seizures based on less than probable cause, and it applies regardless of the nature of the evidence sought to be suppressed."  *Collier v. Superintendent, Coxsackie Corr. Facility*, 2020 WL 2341062, at *11 (N.D.N.Y. May 11, 2020) (citing *Cardwell v. Taylor*, 461 U.S. 571, 572-73 (1983)).

14

The Second Circuit "has made clear that a fourth amendment claim may not be considered by a federal habeas corpus court if the state has provided an opportunity fully and fairly to litigate it." *McPhail v. Warden, Attica Corr. Facility*, 707 F.2d 67, 69 (2d Cir. 1983). To receive habeas review of a Fourth Amendment claim, a petitioner must demonstrate either that the State failed to provide any "corrective procedures" by which Fourth Amendment claims could be litigated, or that the State had such procedures in place but that the petitioner was unable to avail himself of those procedures "because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992). A "mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process," and thus is insufficient to give this Court authority to review Fourth Amendment claims. *Id.* at 72. "It is well-settled that New York State provides for a full and fair opportunity to litigate a Fourth Amendment claim." *Evans v. Giambruno*, 2000 WL 1876642, at *1 (S.D.N.Y. Dec. 26, 2000) (citing *Grey v. Hoke*, 933 F.2d 117, 121 (2d Cir. 1991)).

Petitioner's argument against the application of the *Stone* doctrine is not that New York lacked a procedure for addressing Fourth Amendment violations, but rather that there was a breakdown in that system because of the way the argument was presented by his counsel. Petitioner argues now, as he did in his appellate brief, that his

15

brother was not authorized to open the suitcase which contained the sexual device.  Pet. at pp. 20-23.  Petitioner notes that the trial court did not address this precise argument.  *Id.*  The Appellate Division discussed this matter in a footnote, noting that it was an issue that was not fully explored during the suppression hearing.  *People v. Lancaster*, 143 A.D.3d at 1051 n.1.  Nevertheless, the Appellate Division concluded that "[u]nder the circumstances, the police belief that Fraley was operating within the scope of his authority, when he rummaged through the suitcase at defendant's home, was reasonable given that Fraley had been given control over defendant's home and his possessions."  *Id.*[3]

Cases addressing the second exception to the *Stone* doctrine normally require a showing that the available state procedure was, in essence, a sham, or that the defendant was precluded from utilizing it by reason of an unconscionable breakdown in that procedure, and only under those limited circumstances would "federal intrusion. . . be warranted."  *Gates v. Henderson*, 568 F.2d 830, 840 (2d Cir. 1977) (en banc); *see also, Boyd v. Mintz*, 631 F.2d 247, 250-51 (3d Cir. 1980) (breakdown occurred where defendant had one day to timely file state suppression motion and new, unwritten local policy, which was inconsistent with prior practice, required the submission of a formal application for an extension of time).  Conversely, the law has always been that a mere

---

[3] This view is consistent with existing federal law.  *E.g. Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990).

disagreement with the trial court's decision is not a sufficient basis for habeas review.  It

is the latter that is at issue here, and as noted by the Appellate Division, that argument

would not invalidate the police officer's reasonable belief that the brother held apparent

authority.  The record reflects that Petitioner took advantage of his opportunity to fully

adjudicate the matter in state trial court and on appeal.  *See generally* SR. at pp. 297-

323; 354-460.  Petitioner Lancaster is therefore not entitled to habeas corpus relief on

his claim of an unlawful consent search.

### B. Petitioner's Claims Regarding the Jury

Petitioner has raised numerous issues about the jury that was selected in his

criminal case.  Generally, Petitioner asserts that issues with the jury deprived him of his

constitutional right to a fair trial, and that his counsel's handling of those issues

rendered his representation ineffective.  In general, the right to a jury trial under the

Sixth Amendment guarantees the criminal defendant a fair trial by a panel of impartial

jurors.  *Irvin v. David*, 366 U.S. 717, 722 (1961).  Courts do not require, however, that

the jurors be totally ignorant of the individuals or issues in the case.  *Id.*  Indeed, there is

a presumption of impartiality that attaches, and it is the Petitioner's burden to show the

existence of facts which would overcome that presumption.  *Id.* at p. 723.  Under habeas

review, the trial court's decision whether to strike or not strike a juror is entitled to

deference, even where the court does not offer an explicit analysis.  *Uttecht v. Brown,* 551 U.S. 1, 7, (2007).

To resolve the arguments now asserted by Petitioner, the Court must consider how those arguments were raised at trial and presented on appeal, the substance of his claim, and whether his trial counsel was constitutionally deficient when he made certain strategic trial decisions.

Proceeding in chronological order, Petitioner first objects to the empanelment of two jurors upon the grounds that they did not unequivocally state that they could be impartial.  A selection of the lengthy voir dire between the Court, the prosecution, defense counsel, and the two prospective jurors is as follows:

> **MS. JENSEN**: I hate to use this example, but it's kind of a universal example. Has anybody ever been to the funeral where you look off to the side where some people are crying and mourning and upset, then you look at another place in the room and there are people laughing and smiling and remembering the good times? So, can we say that, maybe, in similar situations people react differently? And maybe differently than you would? Right? But just because somebody acts differently to a certain situation, let's say a, to, let's say, sexual assault than you would, is that something you would hold against them if they acted differently than you would, depending on the situation? What does everybody think about that?
> I'm going to have to start calling people. Mr. Osman, you're like no, don't call on me. What do you think about that? I mean, do you think somebody, if somebody reacts differently than you would in a situation, you could take into account all the factors, like the body language, what they're talking about, the fact that they might be on the witness stand? Do

you think you can take all of that into account or if they acted differently than you would, you automatically do not listen to what they have to say?

**A PROSPECTIVE JUROR**:  I would listen.

**MS. JENSEN**: Do you think you would hold it against them if they reacted differently than you would?

**A PROSPECTIVE JUROR**: No.

**MS. JENSEN**: Anybody else? Mr. Brown?

**A PROSPECTIVE JUROR**: To me, I think it's situational. I think there are certain things that people should react a certain way, and I would be confused and wondering why they wouldn't be reacting how I would think that they should be reacting.

**MS. JENSEN**: Would you be able to keep your mind open and be able to listen to the reasons they reacted to that or take into account all the factors?

**A PROSPECTIVE JUROR**: I would be open and listening, but I would struggle with it. Again, situational.

**MS. JENSEN**: I appreciate that.

**A PROSPECTIVE JUROR**: Your example. Funeral, I understand both sides of that.

**MS. JENSEN**: Right?

**A PROSPECTIVE JUROR**: Right. But there are certain things that wouldn't, you know, understand both sides.

**MS. JENSEN**: And if you didn't understand a reaction, would you hold that against them or would you be able to listen to what they had to say?

**A PROSPECTIVE JUROR**: I would struggle filtering that out, to answer your question.

**MS. JENSEN**: Does anybody else feel similarly, again, if somebody didn't react the way you would react or how you think she would, hold it against her?

**A PROSPECTIVE JUROR**: I think it's a piece of a puzzle, where [sic] are many factors.

SR. at pp. 587-589.

**MS. JENSEN**: Do you think you could hold us to that burden, beyond a reasonable doubt, nothing more, nothing less. As the as the judge instructs you? … Mr. Brown?

**A PROSPECTIVE JUROR**: I could hold you to that burden, yes.

**MS. JENSEN**: And you'd follow the law as a judge instructs it to you?

**A PROSPECTIVE JUROR**: Yes. …

**MS. JENSEN**: Mr. Osman?

**A PROSPECTIVE JUROR**: Yes.

SR. at pp. 593-595.

**THE COURT**: If you are asked would you like to be here, your answer is no. No, I don't want to be here. What, are you crazy? But juries are called as a service to this country, to this state, to this community. Okay? And we ask you to do your job fairly, impartially and objectively. And we don't want you to think it's going to be easy. It's not an easy job, whether it's one victim or 55 victims. It's not an easy job for a juror because your obligation is to be fair, objective and impartial. Look at all the evidence, determine the facts and apply it to the law. If you can do that, you can be a juror.…

**MR. BUTLER**: Okay. Mr. Brown, you brought up some issues before. After hearing now what the Judge says, …

**A PROSPECTIVE JUROR**: And I understand the obligation. I understood what the judge said, the question. I would struggle….

**MR. BUTLER**: Okay. Mr. Osman, same?

**A PROSPECTIVE JUROR**: At the beginning I was a little on edge because having a daughter, having to hear the charges, I kind -- I think I could be impartial.

SR. at pp. 607-612.

Ultimately, no challenge for cause was made or ruled upon by the trial court, and

Petitioner and his counsel did not utilize available peremptory challenges on the two

20

jurors.  SR. at p. 615.  Those jurors were then seated on the trial jury which, as noted above, rendered a split verdict.

Next, Petitioner raises an issue about one juror who disclosed, after her selection, that she knew one of the potential prosecution witnesses, Charles Gardner, who in fact was her nephew.  SR. at pp. 791-792.  The juror self-reported this relationship to the court.  *Id.*  Gardner was identified in a list of 37 witnesses during voir dire, but apparently the juror in question erroneously thought he was an investigator for the police.  SR. at pp. 626 & 791-792.  However, the evening after her selection she spoke with her nephew, who indicated that he had indeed received a subpoena to attend the trial.  SR. at p. 792.

When asked the Petitioner's position on the matter, Petitioner's counsel indicated "He's not a key witness, Judge. I don't have any objection to her remaining on."  SR. at p. 792.  As understood by the trial court judge, had the juror disclosed this information during selection, it would have supported a challenge for cause under state law.  SR. at p. 793.  *See* N.Y. CRIM. PROC. LAW § 270.20(1)(c) (a challenge for cause may be made on the ground that: "[h]e is related within the 6th degree of consanguinity or affinity to … a prospective witness at the trial.").  However, because the issue arose after the juror had been seated, the applicable New York standard was different.  N.Y. CRIM. PROC. LAW § 270.35(1) ("[If] the court finds, from facts unknown at the time of the selection

21

of the jury, that a juror is grossly unqualified to serve in the case or has engaged in misconduct of a substantial nature, but not warranting the declaration of a mistrial, the court must discharge such juror."). As the Appellate Division noted in its decision, the trial court conducted "an appropriate probing and tactful inquiry, in the presence of both counsel, into the juror's ability to be impartial, fair and objective," and as a result adequately demonstrated that the juror was not "grossly unqualified to serve in this case." *Lancaster*, 143 A.D.3d at 1051.

Finally, the Petitioner believes that the trial court erred by failing to dismiss Juror # 2 who Petitioner alleges was sleeping during parts of the trial. Petitioner has attached an Affidavit to his Petition from a court security officer indicating that he observed this juror sleeping on at least two occasions. SR. at pp. 1987-1988. Petitioner, through his counsel, never objected to the juror in question during the trial or asked that he be removed. *Lancaster,* 143 A.D.3d at 1051. The Court did monitor the jury during the trial and did pause briefly in its jury instructions to have the court security Officer inquire with the juror:

> **THE COURT**: Make sure he's awake. I saw your eyes were closed. I was afraid you were going to sleep on me.
> **A JUROR**: No.
> **THE COURT**: You're there. Good enough.

SR. at p. 1599.

*1. The Independent and Adequate State Law Ground Doctrine Bars Review on the Merits of this Claim*

As noted above, many of the issues regarding the jury which Petitioner now seeks to raise are situations that were not objected to by his counsel at trial. No objection was raised to the two prospective jurors during voir dire; to the seated juror who was the aunt of a potential witness; or to the sleeping juror. Under New York law, a contemporaneous objection to any alleged legal error must be made by defense counsel at the trial in order to preserve the matter for appellate review. N.Y. CRIM. PROC. LAW § 470.05(2). The New York Court of Appeals has determined that the preservation rule "require[s], at the very least, that any matter which a party wishes the appellate court to decide have been brought to the attention of the trial court at a time and in a way that gave the latter the opportunity to remedy the problem and thereby avert reversible error." *Garcia v. Lewis*, 188 F.3d 71, 78 (2d Cir. 1999) (alteration in original) (quoting *People v. Luperon*, 85 N.Y.2d 71, 78 (1995) (internal quotation marks omitted)). Not only is the preservation rule codified, but it is recognized and adhered to by both New York and federal courts. *See Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011) ("[W]e have held repeatedly that the contemporaneous objection rule is a firmly established and regularly followed New York procedural rule.").

New York's contemporaneous objection rule is an independent and adequate state law ground independent of the federal question presented here. *Downs v. Lape*, 657 F.3d at 104. Under the independent and adequate state ground doctrine, "[the] Court will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991). The Appellate Division has already ruled that petitioner failed to preserve his jury related claims, and accordingly it is recommended that these claims be denied.

### 2. Merits

Were the Court to proceed to the merits of this constitutional claim, it would recommend denial on this basis as well. Jury selection is, as has been repeatedly noted by the Supreme Court, "particularly within the province of the trial judge." *Skilling v. United States*, 561 U.S. 358, 386 (2010) (quoting *Ristaino v. Ross*, 424 U.S. 589, 594-595 (1976)). Furthermore, a trial court's determination regarding bias and taint, or lack thereof, of potential jurors in connection with a habeas action is entitled to a statutory presumption of correctness and may be overturned only after a showing of manifest error. *Patton v. Yount*, 467 U.S. 1025, 1032, 1036, & 1038 (1984). Upon review of the trial transcript, it is evident that the trial court properly exercised its vast discretion during voir dire and that there was no constitutional violation.

24

## C. Ineffective Assistance of Counsel Claim

In his Petition, Lancaster also maintains that he was denied effective assistance of trial counsel.  Pet. at pp. 30-31.  While Petitioner's related claims are barred because they were not raised during the trial, as noted above, the issue of ineffectiveness was in fact presented, argued, and ruled upon by the state courts.

Under the standards set forth by the Supreme Court, a petitioner alleging ineffective assistance of counsel must satisfy two elements: (1) that defense counsel's performance "fell below an objective standard of reasonableness" and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland v. Washington*, 466 U.S. 668, 688, & 694 (1984).  "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance."  *Harrington v. Richter*, 562 U.S. at 104 (quoting *Strickland v. Washington*, 466 U.S. at 689).  A person challenging a conviction thus must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Strickland v. Washington*, 466 U.S. at 687.  The *Strickland* test imposes a "high bar."  *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

In the habeas context, courts apply a deferential standard on two consecutive levels. First, the *Strickland* standard is applied in a manner which provides great deference to counsel's choices made during his or her representation of the criminal defendant, including decisions made during the heat of a trial. *Strickland v. Washington*, 466 U.S. at 691; *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005); *Hicks v. Ercole*, 2015 WL 1266800, at *21 (S.D.N.Y. Mar. 18, 2015) ("a claim of a constitutional dimension does not arise unless a lawyer's error is so egregious as to amount to a failure to provide minimal professional representation.").

Second, where the state court has already considered and ruled upon the claimed ineffectiveness, a federal court will only grant relief upon a showing that the state court applied the *Strickland* standard to the facts in that case in a "objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 699 (2002). Without overcoming this double deference, Petitioner's Sixth Amendment claim fails.

Petitioner raises a myriad of arguments regarding his criminal counsel's representation. For example, Petitioner faults his counsel for the admission of certain hearsay evidence. Witness Carolyn Bowers testified that she spoke by phone with victim AB, who stated that Petitioner had raped her the night before. SR. at p. 1112. Petitioner's counsel objected on hearsay grounds to this line of questioning. SR. at p. 1110. The Court initially sustained the objection, but thereafter allowed it under the

"prompt-outcry" exception to the hearsay rule.  SR. at p. 1111.  Considering that evidentiary ruling, Petitioner's counsel aggressively cross-examined the witness on the issue, noting that the conversation was never reported to the police and was first disclosed to the district attorney only many months after the fact.  SR. at p. 1113.

The trial court's ruling on the application of the prompt outcry exception was well-founded, and indeed was affirmed by the Appellate Division.  *People v. Lancaster*, 143 A.D.3d at 1054 ("[Petitioner's] arguments regarding rulings concerning the admissibility of hearsay evidence have been examined and determined to be lacking in merit.").  Accordingly, counsel's trial conduct on this issue cannot form the basis for an ineffectiveness argument.  *See Lawrence v. Graham*, 2014 WL 585301, at *11 (W.D.N.Y. Feb. 13, 2014) (counsel was not ineffective by failing to object on hearsay grounds to witness testimony about a victim's delayed rape disclosure because the court "most likely would not have precluded the testimony from coming in under the 'prompt outcry' exception.").

Petitioner next claims that his counsel did not represent him at a *Huntley* hearing because he did not have time to do so.  Pet. at p. 31.  However, the record reflects that defense counsel filed motions seeking to suppress various items of evidence, including Petitioner's statements to the police, and because of that motion a *Huntley* hearing was in fact held.  SR. at 354-455.  At that hearing, the prosecution was prepared to explain

27

by calling several witnesses why there was no initial video evidence of *Miranda* warnings being given to Petitioner and that such a lapse was due to a technical glitch and not intentional. Considering that explanation, the fact that Petitioner had signed an acknowledgement that the was given *Miranda* warnings, and to maximize the court's time, defense counsel made a tactical decision not to go forward on that singular issue. SR. at pp. 361-391. Ultimately, the trial court considered the suppression motions and the voluntariness of Petitioner's statements and ruled against him on those issues. SR. at pp. 457-458. This conduct by defense counsel was neither ineffective nor constitutionally deficient.

Petitioner maintains that while his counsel did seek to suppress from admission the discovery of the sexual device, he did not sufficiently argue that his brother, Fred Fraley, lacked the authority to retrieve the incriminating items from his stored luggage. Pet. at p. 31. There is no showing that this argument would have changed the result of the suppression ruling. Indeed, despite the issue of whether Fraley had actual authority to consent to the search, the Appellate Division indicated that police could reasonably believe Mr. Fraley had apparent authority, and therefore the police conduct in receiving the evidence from Fraley was not a Fourth Amendment violation. *People v. Lancaster*, 143 A.D.3d at 1050. Thus, Petitioner cannot establish the "reasonable probability" of a

different outcome absent counsel's alleged errors and therefore the second part of the *Strickland* test has not been met. *Strickland v. Washington*, 466 U.S. at 694-95.

Petitioner objects to the failure of defense counsel to object to, or strike, certain jurors, or to raise issues involving alleged juror misconduct more forcefully. Pet. at p. 31. In this matter, the Petitioner's experienced counsel participated in jury selection, demonstrated a thorough knowledge of the case, and exercised peremptory and for cause challenges when he concluded they were appropriate. Supporting the Appellate Division's overall finding of effectiveness, federal courts have routinely noted that the decision as to who should or should not be requested to be struck from the panel is intertwined with counsel's defense strategy, and therefore will be very rarely questioned by the court. *Ciaprazi v. Senkowski*, 151 F. App'x 62, 63-64 (2d Cir. 2005) (holding that trial counsel's failure to object to a juror or to request the court make inquiry where the juror may have been sleeping, did not amount ineffective assistance, as that decision may have been based upon counsel's judgment to retain an inattentive juror); *Figueroa v. Heath*, 2011 WL 1838781, at *11 (E.D.N.Y. May 13, 2011) ("In this case, counsel's active participation in voir dire indicates that any decisions to challenge [or not to challenge] jurors were made as part of a reasonable trial strategy, rather than as a result of counsel's failure to provide effective assistance.").

The Appellate Division concluded that Petitioner's counsel "provided zealous advocacy, provided cogent opening and closing statements and raised effective objections, and defendant was ultimately acquitted of several counts of the indictment. Accordingly, counsel's representation was, viewed in its totality, effective, meaningful and competent . . ." *People v. Lancaster*, 143 A.D.3d at 1052. Far from being objectively unreasonable, a view of the record before this Court merely confirms the conclusion of the Appellate Division. Defense counsel, through strong advocacy, was able to obtain an acquittal by the jury on several serious charges of the indictment. Reviewing the record as a whole, the Court concludes that Petitioner had dedicated and passionate trial counsel, whose representation on this difficult criminal case far exceeded the constitutional standard incorporated in the Sixth Amendment. Accordingly, the Court recommends that any claim of ineffectiveness be denied.

### D. Petitioner's Constitutional Challenge to Penal Law § 130.95

Several arguments in the present habeas Petition attacked the constitutionality of New York's predatory sexual assault law, Penal Law § 130.95, both facially and as applied to Petitioner. Pet. at pp. 24-25. Petitioner asserts that he was the only person tried and convicted under the statute; that the statute itself is void for vagueness; that the predatory sexual assault charge is duplicative of the underlying rape and sexual abuse counts and therefore imposes double jeopardy; that the statute incorporates elements of

the charge by reference to other penal law statutes, and therefore violates the New York State Constitution; and that there was insufficient evidence to establish the predicate charges before the grand jury or at trial. *Id.* These arguments are, upon review, defective both procedurally as well as on the merits.

Turning first to the procedural impediments, Petitioner raised the issue of the constitutionality of the Predatory Sexual Assault Statute during his state appeal. The Appellate Division, however, concluded that his challenge to the statute was unpreserved because the "defendant did not object to the statute's constitutionality before, during or after the trial or during the jury charge." *People v. Lancaster*, 143 A.D.3d at 1052. Further, Judge Cawley noted in his decision on Petitioner's subsequent N.Y. CRIM. PROC. LAW § 440 motion that these claims were procedurally barred because they could have been presented properly for appellate review but were not. SR. at p. 2526. The argument that Petitioner wishes to present regarding the predatory sexual assault statute, therefore, is barred by his failure to preserve the issue. As noted previously, New York's preservation rule is an independent state ground for denying a habeas petition.

Petitioner seeks to overcome this impediment by asserting that he is actually innocent of the charged conduct.[4]  To carry this burden, Petitioner must show that in light of all the evidence, including any new material evidence, "it is more likely than not that no reasonable juror would have convicted him."  *Schlup v. Delo*, 513 U.S. 298, 327-328 (1995).  When considering this argument, courts are clear that the phrase "actual innocence" means actual factual innocence, not merely that the proof would be legally insufficient.  *Brousley v. United States*, 523 U.S. 614, 623 (1998).  It is Petitioner's argument that actual innocence has been established because 1) the DNA from victim KB on the sexual device was only found at the halfway point, and therefore the victim's testimony that the device was inserted in its entire length, was false, and 2) the layout of his trailer was such that the sexual assault on victim AB could not have occurred as AB said.  Neither argument, both of which go to the sufficiency of the evidence and are not "new" evidence, is sufficient to support an actual innocence claim.  Further, the Appellate Division has already considered this argument and concluded that the Petitioner had made no showing of actual innocence.  *People v. Lancaster*, 143 A.D.3d at 1049 ("[W]eighing the evidence in a neutral light and deferring to the jury's credibility assessments, we find that, based on the record before us, the weight of the admissible evidence amply supports the convictions.").  This holding is entitled to

---

[4] As Respondent notes, stand-alone claims based on new evidence of actual innocence are not cognizable on habeas review.  *Herrera v. Collins*, 506 U.S. 390, 400 (1993).

substantial deference. *Lawrence v. Graham*, 2014 WL 585301, at *5 (W.D.N.Y. Feb. 13, 2014) ("Because the Appellate Division adjudicated Petitioner's legal insufficiency claim on the merits, the Court must apply the deferential standard set forth in 28 U.S.C. § 2254(d)(1).").

Were the Court to proceed to the substance of the constitutional claim, it has no merit. Petitioner's assertion that he was singled out for prosecution under this new statute is factually incorrect. In fact, there have been convictions and pleas under this statute in every judicial department in New York. *See e.g., People v. Rios*, 102 A.D.3d 473 (1st Dep't 2013), *leave to appeal denied*, 20 N.Y.3d 1103 (2013) (defendant convicted of two counts of predatory sexual assault); *People v. Earl*, 133 A.D.3d 875 (2d Dep't 2015) (appeal by a defendant convicted of predatory sexual assault, rape in the first degree, sexual abuse in the first degree, criminal possession of a weapon in the third degree, and endangering the welfare of a child); *People v. Forney*, 183 A.D.3d 1113, (3d Dep't 2020), *leave to appeal denied*, 35 N.Y.3d 1065 (2020) (conviction of two counts of predatory sexual assault, for which concurrent prison terms of 21 years to life were imposed, affirmed on appeal); *People v. Bullard-Daniel*, 203 A.D.3d 1630 (4th Dep't 2022), *leave to appeal denied*, 38 N.Y.3d 1069 (2022) (conviction of predatory sexual assault under Penal Law § 130.95[1][a] and burglary in the first degree as a sexually motivated felony affirmed). Moreover, none of the courts which have

considered convictions under this statute on appeal have found the law unconstitutional. *Id.*

The void-for-vagueness doctrine asserted by Petitioner, derived from the due process clause, requires that a penal statute define a criminal offense "[1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The essence of the notice prong is to provide "fair warning" and make it "reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997). The arbitrary enforcement prong requires that a statute give "minimal guidelines" to law enforcement authorities, so as not to "permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections." *Kolender v. Lawson*, 461 U.S. at 358 (internal quotation marks omitted). Although a law must provide "explicit standards," it "need not achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth." *Dickerson v. Napolitano*, 604 F.3d 732, 747 (2d Cir. 2010) (internal quotation marks omitted).

The Supreme Court has also made it clear that when the law "unambiguously specif[ies] the activity proscribed," the fact that this proscribed conduct may violate more than one statute does not render the statute void for vagueness. *United States v.*

*Batchelder*, 442 U.S. 114, 123 (1979).  To the contrary, "when an act violates more than one criminal statute, the [g]overnment may prosecute under either so long as it does not discriminate against any class of defendants."  *Id.* at 123–24.

Finally, courts generally consider the vagueness claim only as applied to the facts of the particular case.  *See Maynard v. Cartwright*, 486 U.S. 356, 361 (1988).  This is because "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."  *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 (1982).  Put another way, "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness."  *Parker v. Levy*, 417 U.S. 733, 756 (1974).

The predatory sexual assault statute, N.Y. Penal Law § 130.95(2), as applied, provided fair warning of the prohibited conduct to Petitioner.  The statute incorporates specified sex offenses as predicates which, as relevant here, are rape in the first degree, criminal sexual act in the first degree, and/or aggravated sexual abuse in the first degree.  *Id.*  It then adds the additional two requirements: 1) that the offenses be against two separate victims, and 2) that they occur at separate times.  *People v. Lancaster*, 143 A.D.3d at 1048.

Petitioner speculates that, under the statute, a grand jury could consider numerous predicate crimes, and that the jurors voting in favor of the felony of predatory

35

sexual assault may not agree as to exactly what those underlying crimes are.  As to his case, Petitioner asserts that count VII of the indictment, related to alleged victim HF, charged that Petitioner himself inserted a foreign object into HF's anus, but there was no proof that he performed the act and the testimony was instead that she inserted the object herself.  In Petitioner's view, this creates the potential that his trial jury may have convicted him of predatory sexual assault utilizing a predicate crime, Count VII, for which there was no evidence.  Pet. at p. 24.  Finally, Petitioner asserts that there can be no conviction on the top count because he was ultimately acquitted of all the predicate crimes.

None of these arguments withstand basic scrutiny.  Here, the matter went to trial with five alleged victims testifying against Petitioner.  Ultimately the jury concluded that there was only proof beyond a reasonable doubt as to the predicate crimes against two of the victims, AB and KB.  The allegations of criminal sexual assault in the first degree against AB occurred in November 2010, and the crime of rape in the first degree and aggravated sexual abuse in the first degree against KB occurred in January 2012.  Thus, it was clear which counts formed the predicate offenses for the predatory sexual assault charge, and that these offenses involved two different victims at two different times.  *People v. Lancaster*, 143 A.D.3d at 1048 ("County Court's instructions made clear that the jury had to preliminarily find defendant guilty of one of the enumerated

36

crimes before finding him guilty of one of the same crimes against a separate, subsequent victim, thus addressing the inherent 'temporal implications' of the predatory sexual assault statute."). Petitioner's claim of insufficient evidence before the grand jury as to victim HF is of no moment because he was acquitted of that charge.

Petitioner takes offense to the fact that the predatory sexual assault charge incorporates by reference other felony sexual offenses in New York's penal law. Again, based upon the way this matter was presented to the trial jury, there is no constitutional issue in this case. The trial jury was separately instructed on the elements of each of the predicate claims regarding victims AB and KB, and they were able to come to a unanimous verdict that the People had established those elements. It was not necessary for the trial court to then recharge those elements within the predatory sexual assault instruction, a fact that was agreed to by defense counsel. SR. at pp. 1561-1563. New York's Criminal Pattern Jury Instructions specifically note the appropriateness of this procedure: "[w]ith respect to defining the underlying crime, if the underlying crime is a separate count within the indictment, incorporation by reference to that crime or count is sufficient." N.Y. Crim. Jury Instr. 2d Penal Law § 130.95(2).

Nor is there any issue regarding double jeopardy, as that matter was decisively dealt with by the Appellate Division which vacated the predicate felonies and sentences as being included offenses under the AII felony of predatory sexual assault. *People v.*

*Lancaster,* 143 A.D.3d at 1053 ("[W]e do find merit to defendant's argument, in his pro se supplemental brief, that his convictions for criminal sexual act in the first degree, rape in the first degree and aggravated sexual abuse in the first degree are lesser included offenses to the crime of predatory sexual assault…."). Having successfully petitioned the Appellate Division to dismiss those underlying charges, however, any claim of double jeopardy was thereby extinguished. Nor can the Petitioner maintain that he was in fact "acquitted" of the predicate charges, and thus cannot be convicted of predatory sexual assault, as New York law specifically notes that is not the case. N.Y. CRIM. PROC. LAW § 300.40 ("A verdict of guilty upon the greatest count submitted is deemed a dismissal of every lesser count submitted, but not an acquittal thereon.").

In sum, the Petitioner was fully appraised of the nature of the allegations against him; the trial court properly instructed the jury as to the specific nature of the offenses, including the predicate sexual assault offenses against KB and AB, and the jury's verdict was consistent with the elements of the predatory sexual assault charge.

### E.  Remaining Claims

The Court has reviewed the Petitioner's remaining claims, including the asserted *Brady* violation and the insufficiency of evidence claim, and find them to be without merit for the reasons stated in Respondent's comprehensive and well written brief.

## IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that the Petition (Dkt. No. 1) be **DENIED** and **DISMISSED**; and it is further

**RECOMMENDED**, that no Certificate of Appealability ("COA") be issued because Petitioner has failed to make "a substantial showing of the denial of a constitutional right" as required by 28 U.S.C. § 2253(c)(2). Any further request for a COA must be addressed to the Court of Appeals (FED. R. APP. P. 22(b)); and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days[5] within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human*

---

[5] If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

*Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); Fᴇᴅ. R. Cɪᴠ. P. 72 & 6(a).

Dated: May 19, 2023
           Albany, New York


Daniel J. Stewart
U.S. Magistrate Judge